**RAINES FELDMAN LITTRELL LLP**
Laith D. Mosely (State Bar No. 250832)
   *lmosely@raineslaw.com*
Joshua C. Williams (State Bar No. 317148)
   *jwilliams@raineslaw.com*
1900 Avenue of the Stars, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 440-4100
Facsimile:  (310) 691-1943

Attorneys for Plaintiff JOSEF QU

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JOSEF QU, an individual, | Case No.: |
| Plaintiff, | Assigned to: |
| v. | **COMPLAINT FOR:** |
| FRED JIN, an individual; BRAD BAO, an individual; MARTIJN BROERSMA, an individual; XIN JIN, an individual; MAREN SCHWARZER, an individual; FRANCOIS GRANADE, an individual; CEREBELLUM NETWORK INC., a Delaware corporation; CEF AI, Inc., a Delaware corporation; INTERDATA NETWORK LTD.; and DOES 1–50, Defendants. | 1. **CIVIL RICO – 18 U.S.C. § 1962(C)** <br> 2. **RICO CONSPIRACY – 18 U.S.C. § 1962(d)** <br> 3. **SECURITIES FRAUD – § 10(b) & RULE 10B-5** <br> 4. **SECURITIES FRAUD – SECTION 20(A)** <br> 5. **CIVIL THEFT — CAL. PENAL CODE § 496** <br> 6. **BREACH OF CONTRACT** <br> 7. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** <br> 8. **FRAUD** <br> 9. **NEGLIGENT MISREPRESENTATION** <br> 10. **AIDING AND ABETTING FRAUD** |
| | <u>JURY TRIAL DEMANDED</u> |

Plaintiff Josef Qu ("Qu") complains and alleges as follows:

## NATURE OF THE CASE

1.    Defendant Fred Jin orchestrated one of the largest and most brazen cryptocurrency frauds in history with the active participation of his immediate family members and Board members Brad Bao and François Granade. This was the culmination of a multi-year scheme to steal more than $58 million from Cerebellum Network Inc. investors and the company treasury through secret insider dumping, direct embezzlement of $16.6 million in Regulation D funds, and market manipulation using Gotbit Limited, a criminal enterprise convicted in October 2024 of wire fraud and market manipulation.

2.    This is not Fred Jin's first rug pull as Plaintiff would only later find out. Between 2016 and 2018, Jin founded Funler/Funler Chain, raised millions promising decentralized gaming technology, then insiders dumped tokens and abandoned the project, inflicting losses exceeding 95% on investors. From 2018 to 2019, Jin founded Bitlearn, raised funding and then again abandoned the project shortly thereafter. Jin hid these scams and pressed on — unknown to Plaintiff Jin began executing a similar playbook with the Cere Network.

3.    Jin founded the "Cere Network" — a blockchain startup with a crypto token called the "Cere Token." He sold these tokens to early investors, promising that they, like he, would follow a strict vesting schedule that meant Jin couldn't sell his tokens early and tank the market. He lied. While other investors were prevented from selling their tokens, Jin and his accomplices secretly sold over $41 million on exchanges immediately after publicly launching the tokens.

4.    Unbeknownst to Plaintiff, on November 8, 2021 — the very day of the public listing — Jin caused 550 million $CERE tokens (valued at more than $41.78 million at opening prices) to be transferred from company treasuries to personal exchange deposit addresses controlled by him, his wife Maren

Schwarzer, and his brother Xin Jin, and immediately sold tokens directly into retail markets.

5.    The blockchain evidence is irrefutable: 300 million tokens sent to HTX (120 million at $0.2227 and 180 million at $0.0989) and 250 million tokens to KuCoin (232 million at $0.1485 and 18 million at $0.1483) — all within hours of listing while retail investors remained locked.

6.    Also unknown to Plaintiff, Jin separately embezzled at least $16.6 million in Regulation D investor funds between October 2021 and March 2022, diverting the money from the company's fundraising wallet into two undisclosed personal wallets ("376" and "cD2"). Those funds were then lost in reckless personal DeFi trading, including $6.51 million in the Mochi Protocol collapse, $345,000 in Neutrino USDN, $3.27 million in CVX/ETH pools, and $780,000 in Maple Finance.

7.    Jin then refused to even provide some investors with their purchased Cere Tokens. He used shell companies and secret sales and covered up his wrongdoing by manipulating the market with internet bots to make it appear as if more Cere Tokens were being traded. What Jin did caused the Cere Token price to plummet, destroying its value and leaving investors to suffer the fallout.

8.    Plaintiff Josef Qu, an early SAFT investor whose 27,777,778 $CERE tokens were, when valued at $0.47, worth more than $13,055,555, has seen his investment rendered essentially worthless. Plaintiff brings this action to recover his compensatory and consequential damages, disgorge Jin's illicit profits, and impose a constructive trust over all stolen assets, including luxury real estate in Germany and Florida purchased with embezzled funds.

9.    Plaintiff seeks to bring to light Jin's consistent pattern of fraud, retaliation against whistleblowers, non-payment or underpayment of employees (often in worthless tokens), and complete absence of legitimate business

-3-

1   operations — all while Jin, his wife Maren Schwarzer, and his brother Xin Jin
2   looted the company treasury.

3   **PARTIES**

4       10.     Plaintiff Josef Qu ("Qu") is an individual and citizen of California.
5   He lives in San Francisco.

6       11.     Defendant Fred Jin ("Jin") is an individual and citizen of
7   California and the architect of the fraud alleged herein. Upon information and
8   belief, Jin is a resident of San Francisco, California. He led the fraudulent
9   scheme detailed in this Complaint. He is a co-founder and served as the CEO of
10  the Cere Network. The Cere Network is the name of Jin's technology and
11  cryptocurrency venture that was, in reality, a classic example of "pump and
12  dump" crypto fraud scheme. The scheme was perpetrated by Jin and his co-
13  conspirators and associates — including Jin's family members, close associates,
14  and various foreign and U.S.-based companies under their control. These
15  companies included Cere Network, Ltd., Interdata Network Ltd., Cerebellum
16  Network Inc., Opendata Network Foundation, Cere Holding AG, BNW
17  Network GmbH, Cere Network DAO, and CEF AI Inc. All of these companies
18  have been or continue to be operated and controlled by Jin and his co-
19  conspirators. Although other individuals may be listed as managing agents or
20  executives on corporate documents, Plaintiff understands and believes that they
21  all report and answer to Jin.

22      12.     Defendant CEF AI, Inc. ("CEF AI") is a Delaware corporation.
23  CEF AI is a start-up company owned and controlled by Jin that was used to
24  send or receive illicit funds from Defendants' fraudulent scheme. Upon
25  information and belief, Jin used and is using illicit proceeds from the fraudulent
26  scheme involving Cere Network to fund his new start-up venture, CEF AI.

27      13.     Defendant Xin Jin ("Xin") is an individual residing in California,
28  Fred Jin's brother, who generated private keys, moved tokens from treasury

1  wallets, and received portions of the stolen proceeds.

2      14.    Defendant Maren Schwarzer ("Schwarzer") is an individual

3  residing in Germany, Fred Jin's wife, sole director of BNW Network GmbH,

4  signatory on multiple treasury wallets, and the primary launderer of stolen

5  funds into European bank accounts and luxury real estate in Germany and

6  Florida.

7      15.    Defendant Martijn Broersma ("Broersma") is an individual

8  residing in the Netherlands, former CMO of Cere Network, who made false

9  statements about Fortune 500 partnerships and threatened employees who

10  questioned financial irregularities.

11      16.    Defendant Brad Bao ("Bao") is an individual residing in

12  California, co-founder of Lime, and advisor/board member who lent credibility

13  to the fraudulent scheme. At all relevant times, Defendant Brad Bao served as a

14  senior advisor to Cere Network from its inception and was publicly touted as

15  joining Cere Network's board of directors as early as January 2021. Bao was

16  presented to investors, partners, and the public as a governance-level leader

17  whose involvement signaled institutional legitimacy, operational maturity, and

18  oversight. By virtue of his advisory role, board affiliation, and repeated public

19  association with Cere Network, Bao had access to non-public information

20  concerning token issuance, treasury management, insider transactions, and

21  governance controls, and owed fiduciary-like duties to investors and token

22  purchasers.

23      17.    Defendant Francois Granade ("Granade") is an individual residing

24  in San Francisco and France. Upon information and belief, Granade is a long-

25  time associate of Defendant Fred Jin who knowingly participated in and

26  facilitated the fraudulent scheme. While serving as a board member to the Cere

27  Network, Granade received advisory compensation and other financial benefits

28  despite being aware of the misappropriation of corporate assets and the

concealment of investor funds. Through his continued involvement and silence, Granade provided legitimacy to Jin's conduct and took part in the fraudulent activities described herein.

18.    Defendant Interdata Network Ltd. ("Interdata") is a British Virgin Islands company. Interdata is a shell company and U.S. controlled foreign entity that was used to send or receive illicit funds and tokens from Defendants' fraudulent scheme. Upon information and belief, Jin is the ultimate beneficial owner of Interdata.

19.    Defendant Cerebellum Network Inc. ("Cerebellum") is a Delaware corporation which, upon information and belief, maintains offices in San Francisco, California. It is a shell company that was used to send or receive illicit funds from Defendants' fraudulent scheme. Upon information and belief, Jin is the ultimate beneficial owner of Cerebellum.

20.    Does 1 through 50 are unknown and Plaintiff sues them by such fictitious names. Plaintiff alleges that each Defendant designated as a Doe is legally responsible for the damages alleged herein. When Plaintiff ascertains the true names, involvement, and capacities of Does 1 through 50, he will seek leave to amend this Complaint. At all times relevant times each Defendant, whether fictitiously named or otherwise, was the agent, servant, or employee of the others, and was acting within the scope of such agency, enterprise, relationship, services, or employment.

21.    Defendants are liable for the obligations of each other as alter egos because they each treated the other entities as their own. As noted herein, Defendants disregarded the corporate form of the numerous entities they created and helped control, commingled funds, and used the entities to escape detection and commit fraud. They worked together to monetize the fraudulent conduct through the secret transfer of investor funds and the secret sale of tokens held in violation of their agreements to hold the tokens. In fact, these

entities were created, in whole or in part, for an improper purpose, including to perpetrate the fraudulent scheme alleged herein. It would therefore be unjust to recognize the individual defendant as separate from the entity defendants. Given this relationship, all allegations can be applied equally between the individual defendant and the entity defendants.

22.    Defendants and their co-conspirators formed a group of more than two people that amounted to a civil conspiracy. They agreed and conspired to commit the acts set forth herein. They worked together by, for example, performing individual tasks in concert to cause the secret transfer of investor funds and the secret sale of tokens held in violation of their agreements to hold the tokens. Thus, each Defendant that did not physically commit the tort themselves shared with the immediate tortfeasor a common place or design in its preparation. They are therefore jointly and severally liable for all damages arising from the conspiracy.

23.    Each Defendant knew of the misconduct alleged herein, actively participated in the schemes, and provided substantial assistance or encouragement to the other tortfeasors. When they undertook to provide substantial assistance or encouragement to other tortfeasors, they knew the conduct was tortious. Accordingly, each Defendant is liable for all torts committed as part of the scheme.

## JURISDICTION & VENUE

24.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

25.    This Court also has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for claims arising under both the Securities Exchange Act of 1934 and the Racketeer Influences and Corrupt Organizations Act 18 U.S.C. § 1962(c) & (d).

26.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in it.

## DIVISIONAL ASSIGNMENT

27.     No basis exists for assignment to any particular location or division of the Court pursuant to Civ. L.R. 3-2(c).

## FACTUAL BACKGROUND

**I.      The Cere Network & Cere Token**

**A.      Defendants Promote The Cere Network.**

28.     In 2019, Defendants, especially Jin, promoted Cere Network as a "decentralized" data cloud (DDC) platform, which allow users to store, manage, and process large amounts of data on remote, internet-accessible servers.

29.     Cere Network promoted its plan to use "blockchain" technology to capture, store, and share user and customer data more securely than centralized data centers. Blockchain technology acts as an electronic ledger that records transactions across computers, preventing registered transactions from being altered. This is the same technology that powers cryptocurrencies like Bitcoin and Ethereum.

30.     Cere Network represented that its blockchain technology would facilitate data cloud storage across multiple independent servers that make up a network. This would allow businesses to own and better control and secure customer data.

31.     Cere Network's blockchain technology was to rely on a crypto token called the Cere Token. In short, the Cere Token is a digital asset created on a blockchain — it was designed to be an integral part of the Cere Network. Defendants promoted the Cere Token as a way to pay for services and transactions, provide a governance structure, and encourage participation into the Cere Network. Accordingly, the Cere Token was a "native-utility" token —

1  a type of cryptocurrency native to the Cere Network.

2  **B.    Jin Raises Millions By Pre-Selling Cere Tokens To Investors.**

3  32.    Defendants needed investors and capital to launch the Cere

4  Network and Cere Token. This is often done by offering early investors tokens

5  (in both private and public sales) at a discounted rate before they are "launched"

6  to the public in an Initial Coin Offering (ICO). Jin used this strategy to lure

7  investors to launch Cere Network — including Plaintiff. Using this method

8  between 2019 and April 2021, through Cere Network's affiliated companies

9  (including Interdata), Defendants raised about $42.96 million from private and

10  public investors.

11  33.    Approximately $14.66 million of that amount was raised in private

12  deals called "Simple Agreement for Future Tokens" or "SAFTs." SAFTs allow

13  investors to buy future tokens from a crypto venture before the tokens are

14  launched or distributed, typically at prices that investors hope is lower than

15  what is later sold to the general public on and after the launch date.

16  34.    The remaining $28.3 million came from retail investors who

17  invested in the Cere Tokens on public investment platforms like Republic,

18  DAO Maker, and Polkastarter, which allow individuals to invest in early-stage

19  blockchain projects, token sales, and other offerings. There were over 5,000

20  retail investors in the Cere Token, including U.S. investors. Sale prices for the

21  Cere Tokens in these early purchases ranged from 2 cents to 3.5 cents per

22  token.

23  35.    In the United States, crypto tokens are generally considered

24  "securities" like stock. Companies raising money for crypto ventures therefore

25  register the crypto token with the U.S. Securities and Exchange Commission

26  (SEC) and follow the laws and rules governing the sale of securities.

27  36.    However, Regulation D of Rule 506(c) ("Reg D") is a set of SEC

28  rules permitting companies to raise money by selling securities without

-9-

registering them with the SEC, so long as the investors are "accredited." Selling securities to these "accredited" investors allow companies to bypass SEC registration. By selling Cere Tokens to accredited investors under Reg D, Defendants did not have to register the Cere Tokens with the SEC. However, Defendants are still liable for their material misstatements.

**C.    Plaintiff Executes A Token Sale Agreement.**

37.    Plaintiff entered into an agreement with Cere Network (BVI) Ltd., including its successors and assigns, entitled the Cere Token Sale Agreement dated July 3, 2019 ("Token Sale Agreement").

38.    Not until in or around 2025 did Plaintiff discover that the entity "Cere Network (BVI) Ltd." did not exist — in fact, there is no evidence it was ever registered in the United States or the British Virgin Islands.

39.    Under the Token Sale Agreement, Plaintiff bought 27,777,778 CERE Tokens for $50,000. Jin agreed to release the Cere Tokens to Plaintiff in two tranches: 50% upon IEO and the remaining 50% six months later. The Token Sale Agreement states that the total supply of Cere Tokens is 10 billion — a fact that Jin also publicly represented.

40.    Plaintiff paid the $50,000 under the Token Sale Agreement, which Jin confirmed receiving by email on August 8, 2019.

**D.    The Cere Token Initial Coin Offering**

41.    Through public documents and statements, including a document called the Cere Network Tokenomics, Defendants announced details about the Cere Token and the rules for buying and selling them.

42.    Jin represented that the following groups owned the 10 billion Cere Tokens: (1) public investors from sales on investment platforms like Republic received about 11% or 1.1 billion tokens; (2) "Enterprise Partners" received 9% or 900 million tokens; (3) "Development Outreach" received 8% or 800 million tokens; (4) "Network Development" received 8.3% or 830 million tokens; (5)

"Grants" received 4.9% or 490 million tokens; (6) "Marketing" received 5% or 500 million tokens; (7) the internal leadership team, including Jin, received 5% or 500 million tokens; (8) "Advisors" such as Plaintiff received 6% or 600 million tokens; (9) the "Foundation" received 5% or 500 million tokens, (10) private sale investors receive 20.8% or 2.08 billion tokens; and (11) "ERC20 Staking Rewards" received 5% or 500 million tokens.

43.     Only a small portion of the 10 billion Cere Tokens from the public sales were "unlocked" and thus able to be sold upon the ICO. Jin "locked" the Cere Tokens owned by the others to keep them from being sold for at least three months after the ICO. Cere Network's leadership team and advisors had longer vesting schedules that meant their Cere Tokens were locked for at least six months after the ICO.

44.     In April 2021, Jin publicly released a document known as the Cere Network Tokenomics in advance of the investor sales.

## II.     Defendants' Fraudulent Statements

45.     Jin told Plaintiff (and other investors) before he executed the Token Sale Agreement that Cere Network's leadership team and other "insiders" at the company had agreed to a strict vesting schedule for Cere Tokens. This included Jin, the leadership team, and insiders not being able to sell their Cere Tokens on the market until several months after the ICO.

46.     Jin's representations were false.

47.     From 2019 to 2025, Jin and his accomplices made either false or grossly exaggerated claims about the Cere Network and Cere Token to the public. These fall into five categories.

### A.     Jin's False Enterprise Client Claims

48.     First, Jin and Cere Network made numerous public statements that Cere Network had secured major clients and revenue.

49.     On April 7, 2021, Cere Network announced via a blog, Medium,

1  that it was "already working with a number of Fortune 1000 customers."

2      50.    In a July 2021 "Ask Me Anything" or "AMA" live forum for

3  investors hosted on Reddit, Jin claimed that Cere Network was "running

4  projects with Fortune 1000 companies" and that those contracts had made Cere

5  Network "already in the profitable stage."

6      51.    But no Fortune 500 or 1000 company adopted Cere Network at the

7  time they made this representation. Cere Network had not publicly disclosed

8  any real Fortune 500 company deployments or revenue-generating enterprise

9  use of its platform. These claims were false and misleading, designed to create

10  the illusion of significant enterprise traction and to bolster investor confidence.

11      **B.    Jin's False Token Utility and Adoption Claims**

12      52.    Second, Jin and his accomplices exaggerated the utility, adoption,

13  and readiness of the Cere Token.

14      53.    In a June 2020 public AMA, Jin and Cere Network proclaimed that

15  the path to mass adoption was through enterprise clients and assured the

16  community that "at this rate, we'll have immediate and sustainable growth and

17  adoption post [the] alpha main-net launch."

18      54.    Jin and Cere Network marketed Cere Network as a rare blockchain

19  project with "actual products and real-world clients." The implication was that

20  the Cere Token was already broadly utilized in enterprise settings.

21      55.    These statements were false.

22      56.    In 2020 and 2021, Cere's pre-launch network known as an "alpha"

23  network had no meaningful user base or enterprise usage of the Cere Token.

24  There was no "immediate" adoption that materialized after the initial network

25  launch. The token's touted utilities (powering a "SaaS-DeFi ecosystem" and

26  being used for staking/governance) were largely theoretical or in early-stage

27  testing.

28      57.    By painting a false picture of robust token utility and imminent

-12-

mass adoption, Defendants intended to, and did, inflate investor expectations and token demand.

### C.   Jin's False Technical Readiness Claims

58.   Third, Jin and his accomplices misrepresented Cere Network's technical progress and readiness for deployment.

59.   In September 2021, leading up to a token listing in November 2021, Jin and Cere Network publicly represented that Cere Network's "mainnet" — a fully operational version of its blockchain — was "launching quickly" and that the team would be "fully ready to supercharge the adoption of our ecosystem" immediately after launch.

60.   Jin highlighted the imminent release of Cere Network's "enterprise and NFT solutions" and claimed the platform was essentially production-ready. In reality, Cere's "mainnet" was still in a limited beta/alpha phase at that time, with only a handful of test participants and no open enterprise use. Key features such as data cloud integrations, security audits, and stable network operations were unfinished. Far from "fully ready," the network would remain in development for years beyond 2021.

### D.   Jin's False Transparency & Roadmap Claims

61.   Fourth, Jin and his accomplices made false transparency and roadmap claims about the Cere Network and Cere Token.

62.   In early 2022, Jin and his accomplices publicly announced specific roadmap milestones: Cere Network planned a public mainnet beta release by Q1 2022 and a "full mainnet" launch by May 2022. Investors were told that Cere was on track to deliver these milestones.

63.   However, none of these deadlines were met. The May 2022 full launch came and went without a fully operational mainnet released to the public. Instead, Defendants pushed the timeline back repeatedly — introducing a revised "Vision 2.0" and new launch targets in late 2022 and 2023. Despite

1    claiming that Cere Network's community portal would offer "full
2    transparency," Defendants failed to disclose why roadmap promises were
3    broken or how they would be remedied.

4        **E.    Jin's False DAO Governance & Decentralization Claims**

5        64.    Finally, Jin and his accomplices misrepresented the extent of Cere
6    Network's decentralization and community governance.

7        65.    In late 2023, as Jin and his accomplices belatedly launched a DAO,
8    Cere Network advertised "decentralized, inclusive, and transparent governance
9    where every member has an equal voice in determining Cere's trajectory." A
10   Cere Network public post touted the DAO launch as "a significant step towards
11   100% decentralization of governance."

12       66.    However, the truth was that throughout 2019 to 2023, Cere
13   Network's governance remained overwhelmingly centralized in the hands of its
14   founders and insiders. The promise that "no single entity has disproportionate
15   influence" was false. For most of the project's life, Jin and his accomplices
16   controlled the network's development, treasury, and decision-making.

17       67.    Despite publicly marketing Cere Network as decentralized and
18   community-governed, Defendants concealed that actual control over treasury
19   assets, token supply, and strategic decisions rested with a small group of
20   insiders, including Jin and his close associates, with no meaningful independent
21   board oversight. Brad Bao, who was publicly identified as a board member and
22   long-standing advisor, allowed his reputation and position to be used to
23   reinforce false claims of governance integrity, while failing to object to,
24   disclose, or prevent the concentration of control, insider dumping, and misuse
25   of investor funds.

26   **III.    Jin Secretly Liquidates Supposedly Locked Cere Tokens.**

27       68.    On or about October 31, 2021, 10 billion Cere Tokens were
28   "minted" — meaning, registered and created as a unique token on the Ethereum

-14-

1   blockchain. They were held in "wallets" under Jin's control.

2        69.    After being minted, Jin caused the Cere Tokens to be transferred to

3   the treasury address of [0x218F4947c58A8F2BC8F2f0ccd59494992c6d640f.

4   This treasury address, which is publicly viewable on the blockchain, was the

5   initial custodial point for the substantial volume of Cere Tokens before their

6   distribution and sale. The funds held in this treasury address were supposed to

7   be used for the benefit of the Cere Network.

8        70.    The ICO of the Cere Tokens took place on November 8, 2021.

9   That day, Jin, Bao, Xin Jin, Broersma, and Schwarzer caused the Cere Tokens

10  to be transferred to two centralized cryptocurrency exchanges: HTX Exchange

11  and Kucoin Exchange. These exchanges allow the buying and selling of

12  cryptocurrencies and crypto tokens by the public.

13       71.    On November 8, 2021, Jin and his accomplices caused the

14  following tranches of Cere Tokens to be transferred from the treasury address to

15  HTX Exchange: (1) 120 million Cere Tokens, valued at approximately

16  $26,720,000; and (2) 180 million Cere Tokens, valued at approximately

17  $17,810,000. In total, Jin caused 300 million of Cere Tokens to be transferred to

18  the HTX Exchange valued at $44.53 million.

19       72.    On November 8, 2021, Jin also caused the following tranches of

20  Cere Tokens to be transferred from the treasury address to Kucoin Exchange:

21  (1) 232,000,000 Cere Tokens, valued at approximately $34,440,000; and (2)

22  18,000,000 Cere Tokens, valued at approximately $2,670,000.

23       73.    In total, Jin caused 250 million Cere Tokens to be transferred to

24  Kucoin Exchange valued at $37.11 million. The list of transactions can be

25  found at these URL addresses:

26       (a)    https://etherscan.io/tx/0x580d647780cd9acd1d28ed8f104e7

27      173f78d99fdafec64ca26bd87c69a36ebe6 (120 million Cere

28      Tokens worth $26.72 million to HTX deposit).

(b)  https://etherscan.io/tx/0x97a23f3ed9588c5f17fc3c58906521 e771c505d55ca7abcec958e8a258a6afc4 (180 million Cere Tokens worth $17.81 million to HTX deposit).

(c)  https://etherscan.io/tx/0xc7c85fcfda5eaf8efbdf6a11663b130 dfe0a3692079a1125be04d402b8b16707 (232 million Cere Tokens worth $34.44 million to Kucoin deposit).

(d)  https://etherscan.io/tx/0xb6159bcd30a32e118643d34cb35d0 eecf843b1bd4c59e4ab42972e12def086c6 (18 million Cere Tokens worth $2.67 million to Kucoin deposit).

74.    The Cere Tokens were transferred to Jin's wife, Schwarzer, Jin's brother Xin Jin's HTX Exchange, and Jin's Kucoin personal exchange accounts.

75.    Following these transfers to HTX Exchange and Kucoin, Jin caused approximately $41.78 million in Cere Tokens under his control at HTX Exchange and Kucoin Exchange to be converted from Cere Tokens to a stablecoin called, "Tether" or USDT. As a stablecoin, Tether is pegged 1 to 1 to U.S. dollars and can be easily laundered elsewhere and onshore to fiat US dollars.

76.    From November 8, 2021 to December 31, 2021, Jin sold Cere Tokens, converting them to Tether/USDT. The total proceeds from the conversion were about $41.78 million. This $41.78 million was then moved out of certain HTC Exchange's and Kucoin's accounts, known as "market maker" or "MM" accounts, into many intermediate wallets for them to be laundered and misappropriated.

77.    Based on Plaintiff's eventual suspicions and investigation in 2024 and into 2025, $26,391,614 of these misappropriated funds were then transferred from HTX and Kucoin to these three wallets:

(a)  0x617619b3eAcCeB13F15a80a0e19E04c8F8597cef

(b)  0xB0864E0553b49f870bfF502dcC65475A9C8908fd

(c)  0xcCc467b2B922384E4f0A05f591d91e8B5D87766E

78.    These three laundering wallets were controlled by Jin. The funds were then further dissipated to mask their origins and cover their tracks.

79.    The liquidation of these Cere Tokens as ordered by Jin was made without authorization or notice to the investors. The sale of these Cere Tokens was also contrary to his promises and representations to the public in the Cere Tokenomics in April 2021 that, as an "insider," Jin would not sell Cere Tokens during the "lock-up" period after the ICO.

80.    The sales of these Cere Tokens were made at prices far above what public investors would later be able to obtain. Specifically, Cere Token's price reached an all-time high of around $0.47 on or about November 8, 2021. Jin capitalized on this peak and sold Cere Tokens over several weeks.

81.    These sales transactions created significant downward pressure on the price of the Cere Token. From November 8, 2021 to December 31, 2021 the price of the Cere Token crashed from $0.45 to $0.06 due to the aggressive selling from Jin, Schwarzer, and Xin Jin.

82.    In the years after listing on November 8, 2021, Cere Token's market price collapsed, and Jin and his accomplices started abandoning the project. As of this filing, Cere Token is now trading around $0.00061, which is approximately 99.8% below its peak value. In other words, the Cere Token is utterly worthless as a result of the fraudulent scheme.

83.    In or around 2025, Plaintiff discovered that the $41.78 million had been diverted through offshore shell companies and personal exchange accounts.

84.    In particular, the $41.78 million secretly sold by Jin was routed

offshore through Schwartzer's and Xin Jin's personal exchange accounts; Interdata, a company wholly owned by Jin and based in the British Virgin Islands (BVI); and another company based in Panama called Opendata Network Foundation. The monies were then cycled through Cerebellum. Eventually, the monies were parked in nominee companies — companies designed to only hold and manage assets for an ultimate beneficial owner. These companies included BNW, a German company owned by Schwarzer.

85.    Because Cere Tokens were held by offshore entities or other affiliated wallets, the sales of the Cere Tokens were not immediately attributable to Jin by the public after the ICO.

86.    In perpetrating this fraud, Jin was assisted by other individuals, including Alex Andryunin. He is the founder and CEO of Gotbit Limited ("Gotbit"). Gotbit recently was convicted of wire fraud and market manipulation relating to the artificial inflation of cryptocurrency trading volumes to boost token listings and prices.

87.    The arrangement between Cere and Andryunin — which was negotiated by Broersma and Jin — used Gotbit's "bots" to divide or "slice" bulk sales of Cere Tokens into smaller trades, perform what is known as "cross-exchange transfers," and then recycle volume so that the sales of the Cere Tokens appeared organic. In reality, the trading volume was market manipulation known as "wash trading" that was meant to conceal Jin's and his accomplices' fraudulent scheme.

88.    Upon information and belief, Gotbit received fees for assisting Jin with the market manipulation. The net proceeds after the trades of the Cere Tokens in the approximate amount of $41.78 million were deposited into accounts held and/or controlled by Schwartzer, Xin Jin, and Interdata.

89.    While Gotbit's algorithms were selling off and trading the Cere Tokens, Broersma and Bao were making promotional statements on Reddit,

-18-

Telegram, and in press interviews. They were claiming that the launch of Cere Network's mainnet or operational blockchain was imminent, Fortune 500 clients were "already paying" for the platform, and insiders were "locked" for the long term.

90.    The purpose of these knowingly false statements was to prop up demand and the price of the Cere Token to enable the sell off or "dumping" of the Cere Tokens by Jin.

91.    Andryunin's wash-trading helped create the illusion of healthy volume and price stability. This allowed Jin to sell off his Cere Tokens at a premium until the price of the Cere Token collapsed. The resulting dilution and reputational damage wiped out virtually the entire market cap, scuttled partnerships, and left investors — including Plaintiff — with locked, nearly worthless tokens.

92.    At the time these undisclosed insider sales and wash-trading activities occurred, Defendant Bao continued to publicly associate himself with Cere Network and did not withdraw his advisory or board affiliation. Upon information and belief, Bao was aware, or deliberately avoided confirming, that treasury tokens were being transferred to exchanges and liquidated in violation of stated lock-ups, while promotional statements were simultaneously disseminated to support token price. Bao's continued endorsement and silence constituted substantial assistance to the scheme by lending credibility necessary for the pump-and-dump to succeed.

## IV.    Jin Steals Investor Funds For Personal Trading and Use.

93.    In addition to his pump and dump fraud, Jin stole Cere Network's assets out of official company wallets, diverting these funds for his own personal use.

94.    An investigation into the movement of the misappropriated funds confirmed that Cere Network's primary Republic fundraising wallet was

0xbc8d28cd1821be81bc3a54e935cfd3cf686a0194 (the "RegD Wallet"). The RegD Wallet contained $28 million from over 5,000 retail investors (many are U.S. investors) that was systematically drained by Jin.

95.    Specifically, between October 2021 and March 2022, Jin caused the diversion of at least $16.6 million from the RegD Wallet into two concealed wallets under his control that Plaintiff refers to for purpose of this Complaint as "Jin Wallet A" and "Jin Wallet B." They were Jin's undisclosed personal custody addresses:

(a) Jin Wallet A: 0x41318efd233207db1e78588e4a78fbb30bf1d376

(b) Jin Wallet B: 0x14d2f4d1b0b5a7bb98b8ec62eb3723d461ffbcd2

96.    The transaction ledger on the blockchain provides detailed evidence of these diversions:

(a)    $4,000,000 USDC transferred October 3, 2021 from RegD to Jin Wallet A;

(b)    $3,500,000 USDC transferred October 4, 2021 from RegD to Jin Wallet B;

(c)    $1,000,000 USDC transferred October 11, 2021 from RegD to Jin Wallet B;

(d)    $1,400,000 USDC transferred October 16, 2021 from RegD to Jin Wallet B.

97.    After seizing these funds, Jin funneled them into unauthorized speculation, including high-risk stablecoin pools and uncollateralized lending protocols.

98.    Jin's reckless activities with the misappropriated funds resulted in catastrophic losses: approximately $6.51 million lost in the Mochi Protocol, approximately $345,000 lost in Neutrino USDN's collapse, approximately $3.27 million lost from CVX/ETH liquidity pools, and $780,000 lost in Maple Finance.

1    99.    Jin's speculation ultimately caused realized and unrealized losses

2    of approximately $9.78 million of the stolen $16.6 million of assets from

3    Republic public sale wallets.

4    100.   As of August 2025, investigators confirmed only $585,000 remains

5    in Jin Wallet A and Jin Wallet B, while $9.77 million was dispersed through

6    exchanges and Jin's network of companies and associates.

7    101.   Jin never disclosed the existence of Jin Wallet A, Jin Wallet B, or

8    the laundering network in any corporate report. Instead, he falsely told investors

9    that $22 million was securely held in a hardware wallet under his control and

10   another $2 million in a multi-signature wallet with his wife, Shwarzer. In

11   reality, he had already siphoned away and lost a large portion of Cere

12   Network's funds.

13   **V.    Jin Fails To Deliver Plaintiff's Cere Tokens.**

14   102.   In 2020, before the ICO, Plaintiff repeatedly contacted Jin to

15   inquire and get additional information about Cere Network's token generation

16   event timeline and to provide ERC-20 addresses.

17   103.   Despite Plaintiff's repeated communications and providing the

18   ERC-20 address, Jin and Cere Network refused to deliver the Cere Tokens in

19   accordance with the terms of the Token Sale Agreement, even though

20   Defendants acknowledged Plaintiff's requests, investment, and entitlement to

21   receive the tokens. In total, Plaintiff was entitled to receive approximately 28

22   million CERE Tokens under the Token Sale Agreement. As of the date of filing

23   this Complaint, he has not received any of them.

24   104.   Throughout 2024 and 2025, despite confirmations that Plaintiff

25   invested $50,000 and are entitled to tokens, Jin began to refuse to answer phone

26   calls or emails. Not until this period did Plaintiff come to suspect that Jin and

27   his accomplices had secretly sold their Cere Tokens without disclosing it.

28   105.   But because of the fraudulent scheme perpetrated by Jin and his

associates, Plaintiff did not and could not with reasonable diligence discover that Jin had secretly sold his Cere Tokens. To prevent Plaintiff from uncovering Jin's criminal scheme, Jin and his associates went to great lengths to cover their tracks. They used offshore entities to transact business not directly attributable to Jin; transferred investor funds in secret to privately controlled accounts; had exclusive knowledge of the true state of Cere Network's business, operations, development, and customers that Plaintiff did not and could not discover; made materially false representations regarding Cere Network and the Cere Token in public and private; and secretly manipulated the market to artificially inflate sales of the Cere Tokens.

## FIRST CAUSE OF ACTION

### Violation of 18 U.S.C. § 1962(c) (Civil RICO)

### *(Against Fred Jin, Xin Jin, Maren Schwarzer, Martijn Broersma, Brad Bao, Francois Granade, and Does 1-5)*

106.   Plaintiff realleges and incorporates each prior paragraph as if set forth fully here.

107.   Defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO).

108.   Defendants associated together for the common purpose of engaging in a fraudulent scheme to deceive Plaintiff into performing services and misappropriating investor funds in the Cere Network and Cere Tokens.

109.   Defendants' actions in perpetrating this scheme constituted a pattern of conduct to further racketeering activity.

110.   Defendants are each a "person" under 18 U.S.C. § 1961(3).

111.   Defendants were an "enterprise" under 18 U.S.C. § 1961(4). They operated together for a common purpose, which included carrying out racketeering activity. This association-in-fact enterprise has a clear structure and purpose beyond merely racketeering activity. It is likewise distinct from

1    each individual defendant.

2        112.   By wiring money all over the world, including from California, the

3    enterprise engaged in or affected interstate commerce.

4        113.   As set forth in this Complaint, Defendants' fraudulent scheme

5    involved a pattern of racketeering activity, comprising multiple acts of both

6    mail and wire fraud under 18 U.S.C. §§ 1341, 1343.

7        114.   Defendants' actions not only form a sustained pattern of

8    racketeering activity but also a threat of continued racketeering activity. As

9    described in this Complaint, Defendants made fraudulent representations in

10   public statements between 2021 and 2025, including in advance of the ICO.

11       115.   Defendants' victims extend beyond Plaintiff. Other investors too

12   fell prey to the same pattern and practice of racketeering activity. Worse still,

13   Defendants harmed thousands of those who bought Cere Tokens.

14       116.   Defendants' false representations were intentional and designed to

15   defraud Plaintiff through either mail or interstate wires.

16       117.   As a result, each fraudulently submitted claim constitutes a

17   predicate act of mail or wire fraud in support of Plaintiff's RICO Act claims.

18       118.   It was both reasonable and foreseeable that Plaintiff would rely on

19   Defendants' fraudulent, false submissions.

20       119.   As described above, because of the fraudulent scheme perpetrated

21   by Jin and his associates — making materially false representations, having

22   non-public information regarding the Cere Network, covering their tracks,

23   masking their actions through shell entities, and manipulating the market —

24   Plaintiff did not discover and could not with reasonable diligence have

25   discovered Defendants' fraudulent conduct until in or around 2025.

26       120.   By violating the RICO Act, Defendants directly and proximately

27   caused Plaintiff harm because Plaintiff performed services and paid money to

28   Defendants for Cere Tokens that were never issued or were virtually worthless

-23-

because of Defendants' fraudulent scheme.

121.   As a direct and proximate cause of Defendants' conduct, Plaintiff has been damaged by, among other things, not being able to get the benefit of the bargain in obtaining and selling the Cere Tokens at the market price, which was as high as 47 cents per Cere Token.

122.   Defendants' conduct is malicious, oppressive, fraudulent, willful, and wanton tortious behavior, in blatant and reckless disregard of Plaintiff's rights. Plaintiff should therefore recover punitive damages and exemplary damages in an amount sufficient to punish Defendants and deter them and others from engaging in similar conduct in the future.

## SECOND CAUSE OF ACTION

### RICO Conspiracy – 18 U.S.C. § 1962(d)

### *(Against All Defendants)*

123.   Plaintiff realleges and incorporates each prior paragraph as if set forth fully here.

124.   Defendants conspired to violate 18 U.S.C. § 1962(c). The object of that conspiracy was to conduct or participate in the conduct and affairs of the unlawful enterprise described above through a pattern of racketeering activity.

125.   As described in this Complaint, Defendants engaged in repeated overt predicate acts of fraudulent racketeering to further their conspiracy, the nature of which plausibly infers that violating RICO was the object of the conspiracy. Defendants knew their ongoing acts were part of an overall pattern of racketeering activity.

126.   One purpose of Defendants' conspiracy was to defraud Plaintiff into performing services and investing money in Cere Tokens and to introduce investors to the Cere Tokens. Defendants carried out this scheme, and avoided detection, through using the enterprise.

127.   As described above, because of the fraudulent scheme perpetrated

-24-

by Jin and his associates — making materially false representations, having non-public information regarding the Cere Network, covering their tracks, masking their actions through shell entities, and manipulating the market — Plaintiff did not discover and could not with reasonable diligence have discovered Defendants' fraudulent conduct until in or around 2025.

128.   As a direct and proximate cause of Defendants' conspiracy and the acts taken in furtherance of that conspiracy, Plaintiff suffered injuries to his business and property by, among other things, not being able to get the benefit of the bargain in obtaining and selling the Cere Tokens at the market price, which was as high as 47 cents per Cere Token.

129.   Defendants' conduct is malicious, oppressive, fraudulent, willful, and wanton tortious behavior, in blatant and reckless disregard of Plaintiff's rights. Plaintiff should therefore recover punitive damages and exemplary damages in an amount sufficient to punish Defendants and them and others from engaging in similar conduct in the future.

## THIRD CAUSE OF ACTION

**Securities Fraud – Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5**

***(Against All Defendants)***

130.   Plaintiff realleges and incorporates each prior paragraph as if set forth fully here.

131.   Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 by: (i) employing a device, scheme, or artifice to defraud; (ii) making untrue statements of a material fact or omitting material facts necessary in order to make their statements in light of the circumstances not misleading; and (iii) engaging in an act, practice, or course of business that operates as a fraud or deceit upon Plaintiff and other investors or members of the public.

132.   As alleged herein, in connection with Plaintiff's purchase of securities in the form of Cere Tokens, Defendants made several materially false statements or omissions to Plaintiff that were either false or misleading, including: (a) that Jin and his accomplices would only sell their Cere Tokens after the "lockout" period was over in accordance with the vesting schedule; (b) that Cere Network had Fortune 500 and enterprise clients; (c) that Cere Network's DAO governance and project decentralization were feasible; (d) that Cere Token had utility and was being adopted; (e) that the Cere Network was ready and had users; (f) that Cere Network would operate transparently; (g) that investor funds would be used for the build out and operation of the Cere Network; (h) that Jin had secured having Cere Token listed on Binance exchange; (i) that Plaintiff would receive Cere Tokens in accordance with the Cere Token Sale Agreement; and (j) that Cere Network was already profitable.

133.   As set forth above, each of these statements were either false or materially misleading by omitting material, highly relevant information.

134.   Defendants had a duty to disclose to Plaintiff the information they withheld or misled. Defendants had either superior or exclusive (from Plaintiff) access to information that would have established the misleading or false nature of their statements and the extent of their fraudulent scheme. They also knew that Plaintiff was relying on their statements in choosing to invest in Cere Network. Despite having an obligation to provide Plaintiff with accurate information, or at a minimum not to commit fraud, Defendants failed to do so.

135.   Plaintiff reasonably relied on each of the acts, statements, or omissions made by Defendants set forth herein and had no reason to doubt their truth. Defendants each knew or recklessly disregarded that their statements and omissions were materially false or misleading at the time they were made.

136.   Defendants made these material misstatements in connection with the sale of securities in the form of tokens, and made them with the intent to

deceive, manipulate, or defraud — as evidenced by the depth of their fraudulent, self-dealing scheme of luring investors and purchasers of securities, including Plaintiff, through false statements, market manipulation, and internet bots to secretly profit at the hands of investors.

137.    The scienter of the individual defendants, in particular Jin, is properly imputed to each of the entity defendants. By virtue of Jin and his co-conspirators' ownership, control, and positions at each of the entity defendants, the entity defendants had actual knowledge of the materially false and misleading statements and material omissions issued or disseminated in the name of the entity defendants and intended to deceive Plaintiff and other members of the public. Alternatively, the entity defendants acted with reckless disregard for the truth and failed or refused to disclose such facts as would reveal the materially false and misleading nature of the statements made, even though those facts were readily available to Defendants. Such acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.

138.    Additional information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

139.    As described above, because of the fraudulent scheme perpetrated by Jin and his associates — making materially false representations, having non-public information regarding the Cere Network, covering their tracks, masking their actions through shell entities, and manipulating the market — Plaintiff did not discover and could not with reasonable diligence have discovered Defendants' fraudulent conduct until in or around 2025.

140.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

141.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in connection with his purchase, acquisition, and sale of securities in the form of Cere Tokens, including the economic loss suffered by Plaintiff, including at least $13,055,555.66, which is the estimated value of Plaintiff's 27,777,778 Cere Tokens that were withheld from him, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Securities Fraud – Violation of Section 20(a)

#### *(Against Fred Jin)*

142.   Plaintiff realleges and incorporates each prior paragraph as if set forth fully here.

143.   As set forth above, Defendants committed a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

144.   Jin acted as a controlling person of each entity defendant within the meaning of Section 20(a) of the Exchange Act.

145.   By virtue of Jin's high-level position, participation, direct involvement, and awareness of the entity defendants' actions, operations, and decisions, Jin had the power and ability to control the actions of the entity defendants and their employees.

146.   Jin in fact did control the actions of the entity defendants by committing the fraudulent scheme described herein.

147.   As described above, because of the fraudulent scheme perpetrated by Jin and his associates — making materially false representations, having non-public information regarding the Cere Network, covering their tracks, masking their actions through shell entities, and manipulating the market — Plaintiff did not discover and could not with reasonable diligence have discovered Defendants' fraudulent conduct until in or around 2025.

148.   As a direct and proximate result of Jin's wrongful conduct,

Plaintiff has suffered damages in connection with his purchase, acquisition, and sale of securities in the form of Cere Tokens, including the economic loss suffered by Plaintiff, including at least $13,055,555.66, which is the estimated value of Plaintiff's 27,777,778 Cere Tokens that were withheld from him, in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION

### Civil Theft – Cal. Penal Code § 496

### *(Against Jin, Cerebellum, Interdata)*

149.    Plaintiff realleges and incorporates each prior paragraph as if set forth fully here.

150.    Jin, Cerebellum, and Interdata obtained property belonging to Plaintiff in the form of 28 million Cere Tokens that were never delivered to Plaintiff.

151.    Jin, Cerebellum, and Interdata further obtained, and have kept, Plaintiff's initial investment of $50,000 that on information and belief was misappropriated by Jin or his accomplices, consistent with his practice of embezzlement and fraud as described herein.

152.    Jin, Cerebellum, and Interdata knew that the property was either stolen or obtained through fraud when they received, withheld, concealed, sold, or aided in the theft of Plaintiff's Cere Tokens and investment.

153.    Jin, Cerebellum, and Interdata received, withheld, concealed, sold, or aided and abetted in concealing Plaintiff's stolen property.

154.    Because of Jin, Cerebellum, and Interdata's wrongful theft, Plaintiff has been damaged and continues to be damaged and is entitled to recover his attorneys' fees and costs as well as treble damages pursuant to statute.

1

## SIXTH CAUSE OF ACTION

2

### Breach of the Token Sale Agreement

3

### *(Against Jin, Cerebellum, and Interdata)*

4      155.   Plaintiff realleges and incorporates each prior paragraph as if set

5  forth fully here.

6      156.   Plaintiff entered into the July 8, 2019 Token Sale Agreement with

7  Cere Network (and its successors and assigns), which is a valid and enforceable

8  contract.

9      157.   Jin signed the Token Sale Agreement on Cere Network's (and

10  therefore, as alleged above, Cerebellum and Interdata's) behalf.

11      158.   But unknown to Plaintiff at the time of execution, Cere Network

12  (specifically, "Cere Network (BVI), Ltd." in the Token Sale Agreement) was

13  never registered in the United States or in the British Virgin Islands. There is no

14  evidence that an entity with that name ever existed.

15      159.   Plaintiff performed all his obligations under the Token Sale

16  Agreement.

17      160.   On information and belief, Cerebellum and Interdata are or were

18  successors and assigns of Cere Network and thus parties to the Token Sale

19  Agreement.

20      161.   Jin, Cerebellum, and Interdata breached the Token Sale

21  Agreement, including by failing to issue the Cere Tokens as it requires.

22      162.   As described above, because of the fraudulent scheme perpetrated

23  by Jin and his associates — making materially false representations, having

24  non-public information regarding the Cere Network, covering their tracks,

25  masking their actions through shell entities, and manipulating the market —

26  Plaintiff did not discover and could not with reasonable diligence have

27  discovered Defendants' fraudulent conduct until in or around 2025.

28      163.   As a direct and proximate result of Jin, Cerebellum, and Interdata

-30-

breaching the Token Sale Agreement, Plaintiff has been damaged in the amount of at least $13,055,555.66, which is the estimated value of Plaintiff's 27,777,778 Cere Tokens that were withheld from him, in an amount to be proven at trial.

164.   Because of Jin, Cerebellum, and Interdata's refusal to deliver Plaintiff's Cere Tokens, Plaintiff was unable to get the benefit of the bargain in obtaining and selling the Cere Tokens at the market price, which was as high as 47 cents per Cere Token.

## SEVENTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing
### *(Against Jin, Cerebellum, and Interdata)*

165.   Plaintiff realleges and incorporates each prior paragraph as if set forth fully here.

166.   Jin, Cerebellum, and Interdata voluntarily acknowledged and agreed to the terms of the Token Sale Agreement, which is a valid and enforceable contract.

167.   There is implied by law in every contract an implied covenant of good faith and fair dealing that the contracting party will not act in such a way as to deprive the other contracting party of the benefit of their bargain.

168.   By engaging in the conduct described in this Complaint, Jin, Cerebellum, and Interdata breached the covenant of good faith and fair dealing implied by law into the Token Sale Agreement.

169.   Jin, Cerebellum, and Interdata 's breach of the covenant of good faith and fair dealing was a substantial factor in causing Plaintiff's harm, in an amount to be proven at trial.

-31-

COMPLAINT

1

## **EIGHTH CAUSE OF ACTION**

2

### **Fraud**

3

### ***(Against Jin)***

4       170.   Plaintiff realleges and incorporates each prior paragraph as if set

5    forth fully here.

6       171.   Jin knowingly made, or knowingly caused to be made, material

7    misrepresentations to Plaintiff in person and in writings, including the Cere

8    Token Sale Agreement, in public statements, and in the Cere Tokenomics.

9       172.   Jin made numerous false statements to the public and to Plaintiff,

10   including: (a) that Jin and his accomplices would only sell their Cere Tokens

11   after the "lockout" period was over in accordance with the vesting schedule; (b)

12   that Cere Network had Fortune 500 and enterprise clients; (c) that Cere

13   Network's DAO governance and project decentralization were feasible; (d) that

14   Cere Token had utility and was being adopted; (e) that the Cere Network was

15   ready and had users; (f) that Cere Network would operate transparently; (g) that

16   investor funds would be used for the build out and operation of the Cere

17   Network; (h) that Jin had secured having Cere Token listed on Binance

18   exchange; (i) that Plaintiff would receive Cere Tokens in accordance with the

19   Cere Token Sale Agreement; and (j) that Cere Network was already profitable.

20      173.   Jin knowingly caused the submission of fraudulent

21   misrepresentations by making these statements to Plaintiff and to the public.

22      174.   When making these false representations and material omissions,

23   Jin knew they were false. Jin made them to induce Plaintiff's reliance so that he

24   would provide investment funds and enter into the Token Sale Agreement.

25      175.   Plaintiff reasonably and justifiably relied on Jin's false

26   representations and material omissions. Plaintiff relied to his detriment on Jin's

27   false statements and omissions by investing in Cere Network and entering into

28   the Token Sale Agreement.

176.   Had Plaintiff known the truth, he would not have invested in Cere Network or entered into the Token Sale Agreement. At the time, Plaintiff had no reason to doubt the truthfulness of Jin's representations.

177.   As described above, because of the fraudulent scheme perpetrated by Jin and his associates — making materially false representations, having non-public information regarding the Cere Network, covering their tracks, masking their actions through shell entities, and manipulating the market — Plaintiff did not discover and could not with reasonable diligence have discovered Defendants' fraudulent conduct until in or around 2025.

178.   As a direct and proximate cause of Jin's conduct, Plaintiff has been damaged by, among other things, not being able to get the benefit of the bargain in obtaining and selling the Cere Tokens at the market price, which was as high as 47 cents per Cere Token, resulting in damages of at least $13,055,555.66 in an amount to be proven at trial.

179.   Jin's conduct is malicious, oppressive, fraudulent, willful, and wanton tortious behavior, in blatant and reckless disregard of Plaintiff's rights. Plaintiff should therefore recover punitive damages and exemplary damages in an amount sufficient to punish Jin's and deter him and others from engaging in similar conduct in the future.

## NINTH CAUSE OF ACTION

### Negligent Misrepresentation

### *(Against Jin)*

180.   Plaintiff realleges and incorporates each prior paragraph as if set forth fully here.

181.   Jin was the founder and creator of Cere Network who promoted its DDC and use of blockchain technology to lure investors like Plaintiff into investing and executing a SAFT. By virtue of their business dealing, conveyance of information for the purpose of investing in Jin's network, and

-33-

SAFT, Jin owed Plaintiff a duty to impart complete and correct information.

182. Nevertheless, Jin knowingly made, or knowingly caused to be made, material misrepresentations to Plaintiff in person and in writings, including the Cere Token Sale Agreement, in public statements, and in the Cere Tokenomics.

183. Jin made numerous false statements to the public and to Plaintiff, including: (a) that Jin and his accomplices would only sell their Cere Tokens after the "lockout" period was over in accordance with the vesting schedule; (b) that Cere Network had Fortune 500 and enterprise clients; (c) that Cere Network's DAO governance and project decentralization were feasible; (d) that Cere Token had utility and was being adopted; (e) that the Cere Network was ready and had users; (f) that Cere Network would operate transparently; (g) that investor funds would be used for the build out and operation of the Cere Network; (h) that Jin had secured having Cere Token listed on Binance exchange; (i) that Plaintiff would receive Cere Tokens in accordance with the Cere Token Sale Agreement; and (j) that Cere Network was already profitable.

184. Jin knowingly caused the submission of fraudulent misrepresentations by making these statements to Plaintiff and to the public.

185. When making these false representations and material omissions, Jin knew they were false. Jin made them to induce Plaintiff's reliance so that he would provide investment funds and enter into the Token Sale Agreement.

186. Plaintiff reasonably and justifiably relied on Jin's false representations and material omissions. Plaintiff relied to his detriment on Jin's false statements and omissions by investing in Cere Network and entering into the Token Sale Agreement.

187. Had Plaintiff known the truth, he would not have invested in Cere Network or entered into the Token Sale Agreement. At the time, Plaintiff had no reason to doubt the truthfulness of Jin's representations.

-34-

188.   As described above, because of the fraudulent scheme perpetrated by Jin and his associates — making materially false representations, having non-public information regarding the Cere Network, covering their tracks, masking their actions through shell entities, and manipulating the market — Plaintiff did not discover and could not with reasonable diligence have discovered Defendants' fraudulent conduct until in or around 2025.

189.   As a direct and proximate cause of Jin's conduct, Plaintiff has been damaged by, among other things, not being able to get the benefit of the bargain in obtaining and selling the Cere Tokens at the market price, which was as high as 47 cents per Cere Token, resulting in damages of at least $13,055,555.66 in an amount to be proven at trial.

190.   Jin's conduct is malicious, oppressive, fraudulent, willful, and wanton tortious behavior, in blatant and reckless disregard of Plaintiff's rights. Plaintiff should therefore recover punitive damages and exemplary damages in an amount sufficient to punish Jin and deter him and others from engaging in similar conduct in the future.

## TENTH CAUSE OF ACTION

### *Aiding and Abetting Fraud*

### *(Against Interdata, Cerebellum, CEF AI)*

191.   Plaintiff realleges and incorporates each prior paragraph as if set forth fully here.

192.   Cerebellum, Interdata, and CEF AI are liable for aiding and abetting the fraud perpetrated by Jin described above.

193.   Cerebellum, Interdata, and CEF AI knew of Jin's misconduct.

194.   Cerebellum, Interdata, and CEF AI gave substantial assistance or encouragement to Jin in carrying out his scheme by promoting Cere Tokens, moving the misappropriated funds through crypto wallets and shell entities that they controlled, and receiving stolen and illicit funds.

-35-

195.   As a direct and proximate result of the conduct undertaken by Cerebellum, Interdata, and CEF AI, Plaintiff has been damaged in an amount to be proven at trial, including at least $13,055,555.66, which is the value of Plaintiff's 27,777,778 Cere Tokens that were withheld. Because of Jin's refusal to deliver Plaintiff's Cere Tokens, Plaintiff was unable to get the benefit of the bargain in obtaining and selling the Cere Tokens at the market price, which was as high as 47 cents per Cere Token.

196.   As described above, because of the fraudulent scheme perpetrated by Jin and his associates — making materially false representations, having non-public information regarding the Cere Network, covering their tracks, masking their actions through shell entities, and manipulating the market — Plaintiff did not discover and could not with reasonable diligence have discovered Defendants' fraudulent conduct until in or around 2025.

197.   Cerebellum, Interdata, and CEF AI's conduct is malicious, oppressive, fraudulent, willful, and wanton tortious behavior, in blatant and reckless disregard of Plaintiff's rights. Plaintiff should therefore recover punitive damages and exemplary damages in an amount sufficient to punish Cerebellum, Interdata, and CEF AI and others from engaging in similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Josef Qu prays for judgment against all Defendants as follows:

1. Compensatory damages in an amount not less than $13,055,555.66 plus Plaintiff's pro-rata share of the stolen $16.6 million Regulation D funds, according to proof at trial.

2. Treble damages pursuant to 18 U.S.C. § 1964(c) and California Penal Code § 496(c).

3. Disgorgement of all profits obtained by Defendants from the

-36-

$41.78 million insider dump and $16.6 million embezzlement.

4.  Imposition of a constructive trust over all assets purchased with stolen funds, including but not limited to luxury real estate located in Germany and the State of Florida.

5.  Preliminary and permanent injunctive relief freezing all cryptocurrency wallets, CEF AI Inc. assets, bank accounts, and real property controlled by any Defendant.

6.  Exemplary and punitive, and treble damages in an amount sufficient to punish and deter Defendants.

7.  Attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c), Cal. Penal Code § 496(c), and other applicable law.

8.  Pre-judgment and post-judgment at the maximum legal rate.

9.  Attorneys' fees as permitted by law.

10. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  February 10, 2026                    RAINES FELDMAN LITTRELL LLP

By:  _/s/ Laith D. Mosely_
Laith D. Mosely
Joshua C. Williams
Attorneys for Plaintiff JOSEF QU